**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**PRESTON DALE REYNOLDS**                        **PLAINTIFF**

**v.**                                         **CIVIL ACTION NO.** 3:25-cv-664-DPJ-ASH

**MANAGEMENT & TRAINING CORPORATION,**
**and JOHN AND JANE DOES 1-100**                    **DEFENDANTS**

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

*Jury Trial Demanded*

1. This Complaint is brought by PRESTON DALE REYNOLDS, by and through counsel, against Defendants Management & Training Corporation, and John and Jane Does 1-100.

**JURISDICTION AND VENUE**

2. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983. Supplemental and pendent jurisdiction over related state law claims is appropriate under 28 U.S.C. § 1367 and *F.R.C.P.* 18.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b), as substantial acts and/or omissions that caused Plaintiff's injuries occurred in Lauderdale County, Mississippi, which is located within the Northern Division of the Southern District of Mississippi.

**PARTIES**

4. Preston Dale Reynolds (hereinafter, "Plaintiff") is a citizen of the State of Mississippi and is currently incarcerated at Central Mississippi Correctional Facility ("CMCF"). At all times relevant to this Complaint, Plaintiff was incarcerated at East Mississippi Correctional Facility ("EMCF"), Meridian, Lauderdale County, Mississippi.

5. Management & Training Corporation (hereinafter, "MTC" or "Defendant") is a national for-profit prison management company incorporated in Delaware with its principal place of business in Utah. MTC is the third-largest prison management company in the country, operating 21 correction facilities, having contracts with 17 state correction departments and 7 federal correction agencies. MTC contracted with Mississippi Department of Corrections ("MDOC") for management of prisons' daily operations with the duty to provide humane care and treatment consistent with constitutional and ACA standards. At all times material, MTC managed EMCF. The acts, omissions, and events giving rise to this Complaint occurred under MTC management. MTC is subject to *in personam* jurisdiction of the Court via service of process upon its registered agent, CT Corporation System, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

6. John and Jane Does 1-100 (hereinafter, "Doe Defendants"), are unknown individuals, and/or entities liable to Plaintiff for the acts and omissions alleged herein. Doe Defendants are unknown MTC officers, employees, agents, and or servants, and Plaintiff will amend this Complaint to allege their true names and that each fictitiously named Defendant is responsible in some manner and liable to Plaintiff by reason of negligence, wanton and reckless misconduct, breach of warranty and/or another manner whether alleged herein or not, and by such wrongful conduct, each Defendant proximately caused Plaintiff's damages. Upon information and belief, Doe Defendants were MTC's officers, agents, servants, and employees, acting with permission and consent within the course and scope of said agency and employment.

7. At all times material, Defendants acted under the color of the law, statutes, customs, ordinances, and usage of the State of Mississippi, pursuant to its contract with MDOC.

## FACTS

8. Plaintiff incorporates all allegations in Paragraphs 1 through 7 hereinabove.

9. On July 18, 2024, Plaintiff suffered a gang attack in his cell of Housing Unit 4C ("HU4C"), resulting in severe and life-altering injuries. Plaintiff was discovered the next morning unconscious in his cell after inmates alerted day-shift staff that he needed medical attention.

10. Plaintiff's attack was a direct and foreseeable result of Defendants' systemic failures, including chronic understaffing[1] and inadequate training and supervision of officers. The environment at EMCF was of constant violence and danger due to understaffing, inadequate staff training and supervision, improper inmate counts, security rounds, classification, and housing, unchecked security threat group (STG) violence, and a constant flow of contraband—all of which contributed to Plaintiff's attack and resulting damages.

### *History of Understaffing, Violence, and Inmate-on-Inmate Assaults*

11. Plaintiff incorporates all allegations in Paragraphs 1 through 10 hereinabove.

12. For over a decade, MTC operated EMCF under conditions posing serious risk to inmate safety. Lawsuits and expert reports steadily documented chronic understaffing and systemic failures resulting in harm to inmates.[2] For years, the details of inmate assaults have been virtually *"copy and paste"* of one another.

---

[1] In November 2022, the State Auditor's office demanded millions of dollars from MTC for understaffing and using 'ghost workers,' who are absent employees, allowing MTC to profit rather than employ adequate staff keep prisons safe. *State Auditor Demands Over $1.9 Million from Private Prison Operator,* https://www.osa.ms.gov/news/state-auditor-demands-over-19-million-private-prison-operator; *Mississippi Demands $1.9 Million from MTC for Short-Staffing Private Prison,"* https://www.prisonlegalnews.org/news/2023/jan/1/mississippi-demands-19-million-mtc-short-staffing-private-state-prison/; *3 death lawsuits, allegations of pocketing state funds,* https://www.deseret.com/utah/2023/9/21/23882984/utah-private-prison-company-mississippi-mtc-management-and-training/; *No One's Safe, Not Even Guards,* https://www.themarshallproject.org/2020/02/20/mississippi-prisons-no-one-s-safe-not-even-the-guards; *Investigation Leads to $5 Million Recovery,* https://www.osa.ms.gov/news/state-auditor-investigation-leads-5-million-recovery.

[2] See *Dockery v. Epps, et. al,* S.D. Miss., 3:13-cv-326; *Gipson v. MTC et al,* S.D. Miss., 3:16-cv-624; *Buckley v. MTC et al,* S.D. Miss., 3:22-cv-379; *Marsh v. MTC et al,* S.D. Miss., 3:24-cv-339; *Rivers v. MTC et al.,* S.D. Miss., 3:25-cv-156; *Carthan v. MTC et al,* S.D. Miss., 3:25-v-163. See also *Walker v. MTC et al,* S.D. Miss., 5:14-cv-

13. Defendants' persistent understaffing and failure to train correctional officers created an environment at EMCF where violence was routine.[3] Despite years of instability shown by frequent inmate assaults and deaths, Defendants continued operating under such conditions, displaying deliberate indifference to inmates' safety. MTC's *de facto* policies of understaffing EMCF with inadequately trained and unsupervised guards directly resulted in harm to inmates, specifically Plaintiff.

14. In 2013, a federal class action lawsuit alleged that EMCF's conditions of confinement violated inmates' Eighth Amendment rights, citing insufficient staff, inmates with weapons, broken locks on cell doors, and failure to protect inmates.[4] A copy of the *Dockery* Complaint is attached hereto and incorporated herein as reference to "**Exhibit A**."

15. In 2014, Defendants were put on further notice that understaffing resulted in harm to inmates after Charles McGrew was murdered in his cell by his cellmate. McGrew's cellmate planned and executed the attack between inmate counts because he knew that once the count cleared, another would not occur until 2:00 p.m.[5] McGrew's death illustrated Defendants' systemic negligence and deliberate indifference to inmate safety and provided Defendants with notice that understaffing resulted in failure to conduct security rounds and inmate counts as required, and thus, risked inmates' safety, even inside the cells.

---

98; *Bell v. MTC et al*, S.D. Miss., 5:16-cv-39; *Hernandez v. MTC et al*, S.D. Miss., 5:16-cv-57; *Mauk v. MTC et al*, S.D. Miss., 5:18-cv-68.

[3] In 2023, two correctional officers were in an altercation at EMCF, resulting in one shooting and killing the other. See *Correctional Officer shot, killed at prison at Lost Gap*, https://www.wtok.com/2023/12/26/person-shot-killed-prison-lost-gap/.

[4] See *Dockery.*

[5] *Gipson v. MTC et al*, DOC# 56, filed Oct. 12, 2017, p.5 (Based on his experience, Bullock knew he would not be disturbed in his plan to kill McGrew. Bullock wrapped a bed sheet around McGrew's neck and strangled him until he died. Bullock admitted that *had the officers been doing their security checks it would have made it more difficult for him to have killed McGrew and may have discouraged him from doing so.*) (emphasis added).

16. In 2017, then-Captain of Security Matthew Naidow testified that EMCF ranked among the most violent prisons in the nation, describing it as "top 10" in the country for inmate violence.[6] Officers were often young females who were inexperienced and easily manipulated by inmates.[7] Officers routinely failed to conduct inmate counts and security checks and allowed inmates to move between cells without restriction.[8] Failure to conduct proper counts and rounds directly contributed to violence, as it gave inmates time and opportunity to plan and carry out assaults.[9]

17. Stephen Huffman, MTC's expert witness in McGrew's wrongful death case, testified in 2017 that MTC policy was not to house medium-custody inmates with close-custody.[10] Inmate assaults, even inside cells, could occur any time, highlighting the importance of security rounds and inmate counts.[11] MTC's own expert *agreed* that MTC acted with deliberate indifference by failing to ensure officers performed essential security measures:

> Q. And would you agree that not requiring your correctional officers to conduct the proper rounds and security checks, that could be deemed as being deliberately indifferent?
>
> THE WITNESS: Yeah.

*Gipson v. MTC et al.*, Deposition of Steven Huffman, Vol. II, p.36 lines 11-18.

---

[6] *Gipson*, Deposition of Matthew Naidow, p.87 line 18-24.
[7] *Gipson*, Deposition of Matthew Naidow, pp.18-19 (staff were usually young, mostly female, easily manipulated by inmates, and there was a lot of contraband being brought in…so you're putting people with literally no life experience or street experience, really…either they [officers] would quit and couldn't handle the job, or they would get caught up in the inmate games and be bringing in contraband…)
[8] *Gipson*, Deposition of Matthew Naidow, pp. 42-43, 46; p.61 lines 1-17 (…officers get fired for allowing other inmates into inmate cell and not letting them out.)
[9] *Gipson*, Deposition of Matthew Naidow, p.47 lines 2-5 (inmates are always planning on doing something, so it [failure to conduct rounds and security checks] gives them more time to plan and act on what they're going to do).
[10] *Gipson*, Deposition of Stephen Huffman, Vol. II pp.39-40.
[11] *Gipson*, Deposition of Stephen Huffman, Vol. I p.38, Vol. II pp.32-36.

18. Eldon Vail, Plaintiffs' expert in *Dockery*, reported that EMCF posed an unusual, ongoing risk of harm to inmates' safety and well-being.[12] According to Vail's 2014 report, "EMCF is an extraordinarily dangerous prison. All prisoners there are subjected on a daily basis to significant risk of serious injury."[13] Vail's reports provided MTC with *actual knowledge* of "longstanding and continuing" deficiencies that created dangerous and unconstitutional conditions of confinement. Still, MTC did little or nothing to correct the "deep and systemic" problems that directly resulted in harm to inmates, including Plaintiff.[14]

19. Vail's expert reports specifically noted chronic understaffing as a primary factor behind operational failures that increased inmates' risk of harm. Such failures included poor supervision, improper inmate counts, failure to conduct rounds and security counts, widespread STG networking, and a steady flow of contraband.[15] Staff were not trained to manage EMCF's population of mentally ill and STG-affiliated inmates.[16] Vail warned that inmate assaults could go undetected when officers failed to regularly look inside cells. Still, Defendants allowed inmates to obstruct officers' views into cells by hanging bed sheets in doorways and improperly conducted counts and rounds, in violation of official policy.[17]

20. In 2018, former EMCF Warden Frank Shaw testified in the *Dockery* trial that EMCF could not guarantee basic inmate safety. He admitted that guards "do their best" to keep inmates confined to cells and that required security posts were staffed "if at all possible."[18]

---

[12] See *Dockery*, DOC# 216-3, Expert Report of Eldon Vail (June 16, 2014), pp.7, 24 (deliberate indifference toward inmates' safety and well-being); DOC# 549-2, Expert Report of Eldon Vail (December 29, 2016), p.13; and DOC# 801-1, Expert Report of Eldon Vail (November 16, 2018), pp.15-16, 22-24, 28, 31 (elevated risk of harm present to inmates).
[13] See *Dockery*, Expert Report of Eldon Vail (2014), ¶19 (emphasis added).
[14] *Dockery*, DOC# 549-2, ¶23.
[15] *Dockery*, DOC# 549-2, pp.21-30.
[16] *Dockery*, DOC# 549-2, ¶24.
[17] *Dockery*, DOC# 549-2, ¶49-50. See also *Gibson v. MTC et al*, Deposition of Matthew Naidow, p.48 lines 1-6.
[18] See *Dockery*.

21. Deficiencies creating unconstitutional conditions of confinement over ten (10) years ago *still exist today* and directly resulted in harm to Plaintiff.[19] Plaintiff's attack was the natural and foreseeable consequence of Defendants' systemic failures. Inmate violence was the very harm Defendants were required to prevent, so inmates' intervening acts did not constitute a superseding cause.[20]

22. Defendants had actual knowledge of a substantial risk of harm to inmates and were objectively and subjectively aware of the substantial risk of harm to inmates due to EMCF's chronic understaffing, inadequate staff training and supervision,[21] improper inmate counts and security rounds, improper classification and housing, inoperable cell locks, unchecked STG dominance, and contraband. Despite this knowledge, Defendants failed to take reasonable measures to abate the known risk of harm, demonstrating deliberate indifference to inmates' safety and well-being. As a direct and foreseeable result of Defendants' deliberate indifference, Plaintiff was brutally attacked.

### *Knowledge of Risk of Harm to Preston Reynolds*

23. Plaintiff incorporates all allegations in Paragraphs 1 through 22 hereinabove.

24. Plaintiff's risk of harm was foreseeable and preventable given Defendants' systemic failures and Plaintiff's history of victimization. Defendants consciously disregarded Plaintiff's risk and failed to take reasonable measures to protect Plaintiff from the known and obvious risk of harm. Defendants demonstrated deliberate indifference to Plaintiff's

---

[19] *Dockery*, DOC# 549-2, pp.21-30.
[20] See *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198 (5th Cir. 1994).
[21] See *Gibson,* Deposition of Matthew Naidow, p.49 lines 1-9 ("…if you don't have good quality trainers who really get down to what this is all about, that's an issue. But three weeks in a chair listening to PowerPoints and then a week on-the-job training is *very little training* for a correctional officer in *any* level, let alone walking into East Mississippi Correctional Facility.") (emphasis added).

safety and well-being by failing to protect him, and as a direct and proximate result, Plaintiff sustained life-altering injuries.[22]

25. Prior to the incident giving rise to this Complaint, Plaintiff's inmate file described him as vulnerable and reported that he suffered repeated beatings and required intervention because of his victimization. Plaintiff's MDOC file was accessible to MTC via the "Offender Track" system.[23] Defendants knew or should have known of Plaintiff's heightened risk of harm due to documented assaults against him and a recent recommendation for long-term A&D treatment "*to prevent further harm.*"

26. Plaintiff's assault was not an isolated event, but rather, part of a longstanding and well-documented pattern of inmate violence and correctional neglect.[24] Defendants' chronic understaffing and pattern of recurring and unrestricted inmate violence at EMCF formed an environment of constant danger and threat of violence, creating conditions of cruel and unusual punishment in violation of the Eighth Amendment.[25]

### *Preston Reynolds' Assault*

27. Plaintiff incorporates all allegations in Paragraphs 1 through 26 hereinabove.

28. On or about July 18, 2024, Plaintiff was attacked by inmates in HU4C Cell 114, resulting in severe injuries including severe traumatic brain injury (TBI) with paroxysmal sympathetic hyperactivity, neurogenic bladder, bilateral nasal fracture, diffuse axonal injury[26], blunt cerebrovascular injury (BCVI), subarachnoid and subdural hemorrhages,

---

[22] *Farmer v. Brennan*, 511 U.S. 825 (1994).
[23] See *Gibson*, Deposition of Matthew Naidow, p.35-36.
[24] As the Fifth Circuit recognized in *Gates v. Cook*, 376 F.3d 323, 343–44 (5th Cir. 2004), systemic and recurring deficiencies in prison operations, including violence, understaffing, and failure to supervise inmates, can support a finding of deliberate indifference where officials were on notice and failed to intervene.
[25] See *Alberti v. Klevenhagen et al*, 790 F.2d 1220 (5th Cir. 1986); *Gates v. Cook*, 376 F.3d 323, 343–44 (5th Cir. 2004); *United States v. Hinds County Board of Supervisors* (2025), 22-60203, (5th Cir. 2025).
[26] A diffuse axonal injury (DAI) is caused by shaking or strong rotation of the head by physical forces. Injury occurs because the unmoving brain lags movement of the skull, causing nerve structures to tear. The tearing of nerve tissue

periorbital and scalp hematomas, seizure risk, encephalopathy, tachycardia, impaired gait, cognitive and motor dysfunction, and severe limitations in daily living.

29. Video footage from July 18, 2024, showed Plaintiff asleep on the concrete floor of HU4C outside his cell—a common practice by STG members to assert control over cellmates. Plaintiff's cellmate appeared to wake him, and they both entered Cell 114; Plaintiff was not seen again until the following morning, as he was escorted out of HU4C by stretcher.

30. Video footage captured inmates entering and exiting Plaintiff's cell at all hours without authorization and even showed inmates smoking and snorting substances in plain view of surveillance cameras with no intervention throughout the night of July 18, and morning of July 19, 2024. Immediately before officers discovered Plaintiff unresponsive in Cell 114, the video footage **abruptly stopped** for approximately seventeen (17) minutes. When the video footage resumed, Plaintiff was being put on a stretcher to be escorted out of HU4C.

31. According to records, inmates alerted day-shift staff to Plaintiff's need for medical attention on July 19, 2024, around 9:00 a.m. Officers found Plaintiff in Cell 114, unresponsive and having soiled himself. Plaintiff was transported to Anderson Hospital, with a Glasgow Coma Score (GCS) of three (3). [27] Plaintiff was subsequently airlifted to University of Mississippi Medical Center (UMMC) for emergency neurosurgery due to intracranial bleeding.

---

disrupts the brain's regular communication and chemical processes. Individuals with DAI experience temporary or permanent widespread brain damage, coma, or death. The impairments depend on the function of the affected nerves. It is common for individuals with DAI to have difficulty with thinking skills, especially for memory and learning new information. https://biausa.org/professionals/research/tbi-model-systems/an-overview-of-diffuse-axonal-injury.

[27] The highest GSC score is 15 and lowest is 3. A GSC score of 15 means one is fully awake, responsive, and has no problems with thinking ability or memory. Generally, a GSC score of 8 or lower means one is in a coma. Providers use GCS in connection with head injury to apply scoring ranges to describe how severe the injury is. The ranges are: 15-13, mild TBI; 12-9: moderate TBI; 8-3: severe TBI. https://my.clevelandclinic.org/health/diagnostics/24848-glasgow-coma-scale-gcs

32. Upon information and belief, as per its *de facto* policy, MTC understaffed EMCF on July 18 and July 19, 2024, resulting in Plaintiff's injuries. MTC has a pattern and practice of understaffing EMCF, despite Defendants' undeniable knowledge of prior inmate assaults and deaths that occurred as a direct result of understaffing.

33. It is well known that cell doors in many EMCF units do not lock, and/or can be easily "rigged" to remain unlocked. Such security failures allowed inmates to enter and exit other cells without authorization. Since at least 2013, Defendants were fully aware of these security disasters and failed to take reasonable measures to secure locks on cells, and instead, allowed inmates to roam housing units and cells without restriction.

34. Video footage showed that Defendants failed to conduct the required inmate counts and security checks according to policy on July 18 and July 19, 2024. The purported counts and checks were wholly ineffective. Video footage captured officers failing to look inside HU4C cells, including Cell 114, during counts and rounds. Video footage showed the officers walking by Cell 114 without looking inside to verify Plaintiff's safety, and officers failed to remove a bed sheet obstructing their view into Cell 114, in violation of policy, and with knowledge that failure to conduct proper counts and rounds resulted in harm to inmates, specifically Plaintiff.

35. According to MTC's investigation, night-shift officers assigned to HU4C on July 18, 2024, admitted they failed to perform counts and rounds and were unaware of Plaintiff's attack until being questioned on July 19, 2024. Officers assigned to day-shift on July 19, 2024, did not know Plaintiff was attacked until inmates alerted staff that he needed medical attention around 9:00 a.m. on July 19, 2024.

36. MTC's investigation confirmed that *security checks and counts did not follow policy*, and their employees left Cell 114, a crime scene, unsecure prior to investigation's arrival. Plaintiff would have been discovered sooner if MTC sufficiently staffed EMCF and required officers to conduct counts and security rounds in accordance with official policy.

37. MTC's investigation identified five (5) inmates as assailants in the gang attack against Plaintiff in HU4C Cell 114. Each assailant had an extensive history of violence, STG activity, and/or rule violations for disruptive and/or gang behavior and assaults:

    i. D. Strahan: close custody; Black P. Stone / Vice Lord STG; Plaintiff's cellmate.

    ii. E. Neal: medium custody; Stone STG.

    iii. D. Balam: medium custody; Crip STG.

    iv. B. Henderson: medium custody.

    v. R. Tidwell: non community minimum custody.

38. On July 1, 2024, inmate Strahan assaulted his cellmate in HU4C Cell 114. On July 3, 2024, Defendants assigned Plaintiff to HU4C Cell 114 with Strahan as his cellmate. Plaintiff was a medium custody inmate[28] with no STG affiliation and at high risk of harm. Defendants knew or should have known of Plaintiff's heightened risk of harm and ignored that known and obvious risk, and with deliberate indifference, Defendants housed Plaintiff with a violent cellmate, resulting in the gang attack against him.

39. Inmates' files were at Defendant's fingertips through "OffenderTrak."[29] Inmate Neal's MDOC file showed that he was affiliated with Black P. Stone STG, had a prior escape

---

[28] *See* SOP 22-01-01 pp. 9, 15: Medium custody: offender displayed desire to be considered responsible and presents moderate risk. This level offender is housed in a medium security correctional facility and must be under direct/constant armed correctional supervision when engaging in activities outside the perimeter of the correctional facility. Offenders are permitted to move about the housing unit or security work area but are to be within direct observation of staff.

[29] See *Gibson*, Deposition of Matthew Naidow pp.35-36.

conviction, and an extensive history of gang assaults against inmates and officers, which Defendants knew or should have known.[30] Inmate Balam's MDOC file showed that he was affiliated with Crip STG, had two (2) prior convictions under the Mississippi Streetgang Act, and a history of rule violations for assaults against inmates, which Defendants knew or should have known.[31] Chronic understaffing and inadequate training and supervision of officers resulted in failures which placed vulnerable inmates like Plaintiff among habitually violent inmates and created a breeding ground for violence.

40. Defendants failed to properly oversee inmates in HU4C on July 18 and July 19, 2024. Defendants either (a) failed to assign an officer to HU4C post; or (b) assigned an officer to HU4C who failed to observe and/or ignored video footage of a *free-for-all* with inmates moving freely throughout the unit and individual cells in plain view of surveillance cameras; or (c) hired and retained officers who failed to perform their duties to protect inmates from harm and/or facilitated or allowed Plaintiff's attack. Defendants and their employees' actions and inactions constituted negligence, gross negligence, and deliberate indifference to the safety and well-being of inmates, specifically Plaintiff.

## § 1983 CAUSES OF ACTION: EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS- UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT

41. Plaintiff incorporates all allegations in Paragraphs 1 through 40 hereinabove.

---

[30] See *State v. Edward Lamont Neal*, in the Circuit Court of Lowndes County, Case No. 2007-0191-CR1.
[31] Balam was indicted in Forrest County in 2016 for conspiracy and Mississippi Streetgang Act enhancement (Forrest County Circuit Court, Case No. 18CI1:16-cr-00547, 547-1), and in 2020 he was indicted for murder and Mississippi Streetgang Act enhancement (Forrest County Circuit Court, Case No. 18CI1:20-cr-00141, 141-1).

42. Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. Defendants were subjectively aware of and disregarded the known and obvious risk of harm by failing to take reasonable measures to abate it.[32]

43. Defendant MTC had the responsibility and duty to supervise, oversee, and control the training and job performance of staff, as well as the daily operations of EMCF. Defendants had a duty to ensure that EMCF was maintained in a safe condition, suitable for human occupation and compliant with constitutional requirements. Defendants had the duty to ensure that officials acted in compliance with the laws and Constitutions of the State of Mississippi and of the United States and did not deprive inmates of their rights, including the duty to ensure that conditions of inmate confinement did not impose cruel and unusual punishment in violation of the Eighth Amendment.

44. Defendants' persistent and widespread customs, policies, and practices were so common and well-settled as to constitute official policy. MTC's final policymakers had actual or constructive knowledge of these customs and consciously chose to disregard the known risks. Such customs, policies, and practices were the moving force behind Plaintiff's injuries.[33]

45. By and through Defendants' deliberate indifference to the safety of inmates, including Plaintiff, and establishment of customs, policies, and practices which created unconstitutional conditions of confinement, MTC and Doe Defendants 1-100 violated the clearly established constitutional rights of Plaintiff, including but not limited to:

    a) Right to be free from cruel and unusual punishment under the 8th and 14th Amendments

---

[32] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).
[33] See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002).

    b)    Right not to be deprived of liberty without due process of law

    c)    Right to be safe and protected from injury while in Defendants' custody

    d)    Right to be protected by prison officials and guards while under their control

    e)    Right to be free from excessive and unreasonable force, and

    f)    Right to timely and adequate medical treatment.

46. Each Doe Defendant personally participated in acts and/or omissions giving rise to this Complaint, including but not limited to failing to observe surveillance video of inmates entering and exiting Plaintiff's cell without authorization, inmates snorting and smoking contraband drugs in plain view of surveillance video, failing to conduct required inmate counts and security checks according to policy, and disregarding known threats to Plaintiff's safety.

47. Doe Defendants' actions were not objectively reasonable. At all times relevant, Doe Defendants were acting under the color of state law. As a direct and foreseeable result of Doe Defendants' actions, Plaintiff was attacked by inmates, resulting in damages.

48. Defendant MTC, by and through Doe Defendants in their individual capacities, established customs, policies, and procedures which directly and proximately caused the deprivation of Plaintiff's constitutional rights as alleged herein. Defendants were deliberately indifferent to the safety of inmates housed at EMCF, specifically Plaintiff. MTC maintained and operated EMCF in such a manner that the conditions of confinement resulted in a comprehensive and pervasive pattern of serious deficiencies in providing for the basic human needs of inmates detained at EMCF in every respect.

49. Such unwritten policies, customs, and practices include but are not limited to:

    a) Failing to adequately staff EMCF with trained and qualified guards assigned to the housing units and allowing EMCF to be understaffed.

    b) Inadequate and improper procedures and practices in screening, hiring, training,

supervising, and disciplining officers who practice, condone, or use excessive force upon EMCF inmates in violation of their constitutional rights.

c) Inadequate and improper procedures, policies, and practices for investigating improper activities by correctional officers either through offender complaints of misconduct or through internally-initiated complaints or investigations which permit guards to aid and abet STG members housed at EMCF.

d) Inadequate or improper procedures, policies, and practices for identifying and taking appropriate action against correctional officers in need of re-training, corrective measure, reassignment, or other non-disciplinary actions, through a positive or early-warning system designed to prevent violations of inmates' rights.

e) Condoning correctional officers' facilitating and/or allowing inmate assaults.

f) Failing to institute proper STG management policies and procedures.

g) Failing to prevent and/or investigate threats of violence made against inmates by other inmates which are reported to EMCF officials.

h) Failing to establish policies and procedures to limit the flow of illegal contraband into the facility, including but not limited to drugs, weapons, and cell phones, all of which contributed to the atmosphere of violence at EMCF.

i) Allowing inmates to compromise cell doors and permitting inmates to leave their cells any time, even when they are supposed to be on lockdown, contributing to the atmosphere of violence on the dates of Plaintiff's assaults.

j) Failing to make proper cell checks within established guidelines to ensure inmates' safety.

k) Improper classification and housing of inmates including failure to separate inmates with STG history and assaults, and

l) Regularly denying and delaying access to timely and adequate medical care and treatment, including life-saving medical assistance.

50. Upon information and belief, MTC and Doe Defendants knew Plaintiff was at risk of assault and failed to take steps to prevent it. Defendants acted with deliberate indifference to the safety of EMCF inmates, particularly Plaintiff, resulting in a foreseeable and preventable attack that caused Plaintiff's injuries and damages.

51. The actions and inactions of Defendants were in accordance with official policies, customs,

and practices of MTC, or at the direction and with the approval of MTC officials in depriving Plaintiff of his rights. These practices were a moving force behind the violation of Plaintiff's constitutional rights and demonstrate Defendants' deliberate indifference to inmate safety and well-being. Such deliberate indifference caused Plaintiff's assault, which was foreseeable and avoidable, and resulted in life-changing injuries.

52. From Defendants MTC and Doe Defendants 1-100, jointly and severally, Plaintiff seeks recovery of all compensatory and punitive damages to which Plaintiff is entitled because of the conditions of confinement and damages suffered therefrom.

## NEGLIGENCE/GROSS NEGLIGENCE

53. Plaintiff incorporates all allegations in Paragraphs 1 through 52 hereinabove.

54. At all times relevant, Defendant MTC and Doe Defendants, as their employees, had a duty to exercise ordinary care for EMCF prisoners, including Plaintiff. MTC and Doe Defendants breached that duty by failing to use ordinary care that a reasonable person would use to avoid and prevent injury to others, *i.e.* in the case *sub judice*, provide appropriate, reasonable, necessary supervision to avoid and prevent injury – the failure of which led directly to incontrovertible damage sustained by Plaintiff. This breach was so egregious as to amount to gross negligence.

55. Defendants and their employees were negligent in failing to monitor Plaintiff's cell and/or HU4C on a routine basis and failing to conduct security checks and rounds as required. Defendants failed to provide appropriate, reasonable, and necessary supervision to avoid and prevent harm to inmates, specifically Plaintiff. Defendants understaffed EMCF and did not manage its violent atmosphere with sufficient trained or qualified guards.

56. Had Defendants properly staffed EMCF with sufficient staff, the officers on duty July 18

and July 19, 2024, would have performed inmate counts and security checks in accordance with policy, and Plaintiff's attack would not have occurred, or it would have been interrupted, or Plaintiff would have been discovered in time to render effective medical assistance. Instead, Defendants did not conduct counts or checks as required to avoid and prevent harm to inmates, and as a result, Plaintiff suffered damages.

57. Plaintiff's attack was the reasonably foreseeable outcome of Defendants' and their employees' acts and omissions. These acts and/or omissions were substantial factors in causing Plaintiff's injuries and accompanying damages.

## NEGLIGENT HIRING AND SUPERVISION

58. Plaintiff incorporates all allegations in paragraphs 1 through 57 hereinabove.

59. Plaintiff alleges Defendant MTC negligently, or with gross negligence, hired, supervised, and retained its employees and agents, by *inter alia*, (a) failing to care for and ensure Plaintiff's health, safety, and well-being while at EMCF; (b) failing to properly train, supervise, discipline, retain, hire and/or discharge its employees, agents, and/or representatives; and (c) were otherwise negligent or grossly negligent in their care and safety of Plaintiff, and as a direct and proximate result, Plaintiff suffered damages.

## PUNITIVE DAMAGES

60. Plaintiff incorporates all allegations in Paragraphs 1 through 59 hereinabove.

61. Defendant MTC and Doe Defendants 1-100 acted in complete disregard for Plaintiff's safety by acting in a negligent and/or grossly negligent manner as described herein. The actions of these Defendants warrant punitive damages.

62. Defendants' actions exhibited gross negligence and direct disregard for the safety of Plaintiff. Punitive damages should be awarded against Defendants. Defendants' tortious

actions caused Plaintiff's assault and Plaintiff's serious physical injuries, emotional distress, mental anguish, pain and suffering, and medical expenses.

63. Plaintiff seeks recovery for past and future medical expenses; loss of earning capacity; physical impairment, disfigurement; physical pain and suffering; emotional distress, mental anguish; loss of enjoyment of life; and all other damages recoverable under federal and state law.

## PRAYER FOR RELIEF

Plaintiff prays that upon a jury trial of this cause, the Court will award all relief due Plaintiff as set forth herein, including but not limited to the following:

A. Compensatory damages of, from, and against Defendants, each and severally, in amount to be determined at trial,

B. Punitive damages of, from, and against Defendants in their individual capacities, in an amount to be determined at trial,

C. Reasonable attorney fees and all costs pursuant to 42 U.S.C. § 1988,

D. Pre- and post-judgment interest, and

E. Such other general and specific relief as appears reasonable and just in this cause.

RESPECTFULLY SUBMITTED, THIS the 29th day of August 2025.

**PRESTON DALE REYNOLDS**

BY: _____
COURTNEY D. SANDERS

MERRIDA (BUDDY) COXWELL (MB# 7782)
COURTNEY D. SANDERS (MB# 106444)
**COXWELL & ASSOCIATES, PLLC**
500 North State Street
Jackson, Mississippi 39201
Telephone: (601) 948-1600
Facsimile: (601) 948-7097
merridac@coxwelllaw.com
courtneys@coxwelllaw.com
*Attorneys for Plaintiff*